UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA                     :

                                             :

              v.                             :          CRIMINAL NO. 07-459 (RBK)

                                             :

AGRON ABDULLAHU                              :

---

## SENTENCING MEMORANDUM

---

RICHARD COUGHLIN
Federal Public Defender
800-840 Cooper Street, Suite 350
Camden, New Jersey 08102
(856) 757-5341

Julie A. McGrain, Esq.
Research & Writing Attorney
On the Brief

Attorneys for the Defendant,
Agron Abdullahu

TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT I:         THE CRIMINAL CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

POINT II:        POSSESSION OF THE TWO BORROWED WEAPONS . . . . . . . . . . . 6

POINT III:       CONDUCT AT THE RANGE AND AT THE POCONOS . . . . . . . . . . 9

POINT IV:        MR. ABDULLAHU'S HISTORY AND CHARACTER . . . . . . . . . . . . 17

POINT V:         OBSTRUCTION ADJUSTMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

POINT VI:        UPWARD DEPARTURE PURSUANT TO U.S.S.G. §5K2.14 . . . . . . . 22

POINT VII:       UPWARD DEPARTURE PURSUANT TO U.S.S.G. §2K2.9 . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CERTIFICATE OF SERVICE

TABLE OF AUTHORITIES

Cases                                                                                    Page

Gall v. United States, 128 S.Ct. 586 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 25

United States v. Cole, 357 F.3d 780 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

United States v. Cooper, 437 F.3d 324 (3d Cir. 2006)  . . . . . . . . . . . . . . . . . . . . . . . .  25

United States v. Dale, 498 F.3d 604 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Davis, 380 F.3d 183 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

United States v. Hernandez, 83 F.3d 582 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

United States v. Hertzog, 186 Fed.Appx. 314, 2006 WL 2034457
       (3d Cir. July 19, 2006) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

United States v. Leahy, 169 F.3d 433 (7th Cir. 1999)  . . . . . . . . . . . . . . . . . . . . . . . . .  22

United States v. Uca, 867 F.2d 783 (3d Cir. 1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Statutes

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 25

Sentencing Guidelines

U.S.S.G. §3C1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 19, 20

U.S.S.G. §3C1.1, comment. (n. 4(a)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S.S.G. §5K2.9  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 25, 26

U.S.S.G. §5K2.14  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 22, 23

Other Authorities

L.Civ.R. 5.2.12(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION

After evaluating its proofs, intelligence sources and information about Agron Abdullahu, the government, to its credit, acknowledged that Agron Abdullahu was at worst an unwitting dupe in an alleged terror plot, and agreed to allow him to plead guilty to a five year conspiracy charge. The object of the conspiracy was that Mr. Abdullahu allowed Dritan, Eljvir, and Shain Duka ("the Dukas"), who although in this country for nearly 20 years, were nevertheless not here legally, to shoot his guns in the Poconos. Having made the difficult, but principled, decision to allow a disposition that accurately reflected Mr. Abdullahu's knowledge and conduct, the government has seemingly acquired a case of seller's remorse and moved for an upward adjustment pursuant to U.S.S.G. §3C1.1, upward departures pursuant to U.S.S.G. §§5K2.9 and 2.14, and a sentence above the recommended range on the basis of 18 U.S.C. § 3553(a).[1]  The defendant opposes the government's motions.  The request for the §3C1.1 adjustment is based on the graffiti Mr. Abdullahu carved in his cell after his bail hearing.  The graffiti - aside from obstructing his chances for release - was not a threat (the light switch plate was never regarded as a weapon, but was instead used to carve the graffiti - an act that Mr. Abdullahu not only admitted, but said he was "sorry" for and offered to paint over to make amends, and for which he was fined $49) and it obstructed nothing in the government's case.  The departure and § 3553(a) arguments rest upon selected excerpts from conversations that occurred in the Poconos and gross distortions of other conversations and events.  The arguments at their heart rest on the

---

[1]The government filed its sentencing memorandum electronically, in violation of the rules established by this Court.  See L.Civ.R. 5.2.12(b)(5) (excluding criminal sentencing memoranda from electronic filing). Unlike the government, Mr. Abdullahu will respect the rules which are supposed to apply equally to all litigants. If the Court intends to make the defendant's submission public - which we oppose - redacted versions of the defendant's exhibits should be used to protect the privacy of individuals who were assured that the Court rules would preclude disclosure to the public.

proposition that Mr. Abdullahu should be punished more severely because of thoughts and statements expressed by others. The defendant respectfully submits that the government's motions should be denied and that he be sentenced within the advisory guideline range set forth in the Presentence Report.

## POINT I

## THE CRIMINAL CONDUCT

Amid the swirl of publicity arising out of the accusations and charges lodged against the other individuals in this case, comes the sentencing of Agron Abdullahu. As the Supreme Court has noted recently, sentencing decisions should reflect an individualized assessment of the person being sentenced and the criminal conduct that brings that person before the Court. See Gall v. United States, 128 S.Ct. 586, 598 (2007). Due to speculation, over-emphasis on isolated comments and gross distortions concerning Mr. Abdullahu's conduct, knowledge and state of mind, there is a grave risk that, rather than an individualized assessment that leads to a sentence that is "sufficient but not greater than necessary to achieve the purposes" of sentencing, a sentence that reflects the speculation and distortions will result. 18 U.S.C. § 3553(a). The first step to insuring that such a miscarriage does not occur is to focus on the crime committed and the evidence that sheds light on Mr. Abdullahu's knowledge and intent.

First, Mr. Abdullahu's criminal conduct was limited to allowing the Dukas to use two firearms he owned and two firearms he borrowed with the Dukas' assistance at a firing range in Pennsylvania. Mr. Abdullahu did not otherwise "train," "supply" or "arm" the Dukas or anyone else. Instead, in order to facilitate what he perceived to be two vacations in the Poconos with friends and their associates - as many as 15 people participated - he brought firearms he lawfully possessed so that anyone interested would be able to participate. The trip was never described to him as anything other than recreational. There was no suggestion that the participants were there to "prepare" for an assault on United States military installations or anyone else. Instead, the shooting was merely one activity among many that the group engaged in. In addition to shooting,

3

they swam, played basketball and pool, went skiing, horseback riding and hiking, and played paintball. As foreign as the idea may be to some, the fact is that a surprisingly large segment of the population shoots guns at ranges solely for pleasure. They do not hunt. They do not otherwise carry firearms. They simply like to shoot guns, and when they do so, they often go through large amounts of ammunition. See Investigation Reports, attached hereto as Exhibit A. Consequently, the idea that a group of young men would go to a shooting range while in the Poconos and fire a couple of hundred rounds each was neither suspicious nor unusual to Mr. Abdullahu, and cannot fairly be said to raise any suspicions. He had visited shooting ranges in New Jersey with friends - including the Dukas - on a number of occasions in the past, and to the extent the two Pocono trips involved shooting, they were no more than a natural extension of that perfectly legitimate activity.[2]

Mr. Abdullahu had known the Dukas for several years. He met them at the pizza shop they used to own, and for a while they were fairly close friends. Mr. Abdullahu shared an ethnic background with the Dukas and like him, they were immigrants to the United States. Mr. Abdullahu visited the pizza shop regularly, almost daily for a while. Over the years, he went fishing and played soccer with the Dukas. Before the Dukas stopped drinking alcohol, they went out together. After the Dukas closed the pizza shop, Mr. Abdullahu had less occasion to see them. At the same time, the Dukas started to become more interested in and devoted to their religion. Mr. Abdullahu did not share their interest, and over time, they drifted apart as they simply had less in common. Through his association with the Dukas, Mr. Abdullahu was aware of their immigration status. As a result, he knew that although they were trying to legitimize

---

[2]The Dukas rented the guns they used at the ranges in New Jersey.

4

their status, they were in this country illegally because they had over-stayed their visa. He was also aware of the evolving nature of their rhetoric including statements that reflected hostility toward the United States as a result of its policies in the Middle East. In retrospect, he, of course, wishes that he had treated their comments more seriously and distanced himself further. At the time, however, he regarded most of what they said as belligerent nonsense that reflected their frustration and ignorance. Particularly before the February 2007 trip, however, the belligerent rhetoric was hardly the sum total of the Dukas, at least as far as Mr. Abdullahu knew them. They were instead an entertaining diversion from work. To Mr. Abdullahu, the Dukas were always a little bit "goofy", but they were never violent, threatening or abusive. They were people with whom he could fish, talk about cars, and discuss the difficulties common to immigrants. As a result, even when they made their most outlandish remarks,[3] Mr. Abdullahu dismissed the comments as irresponsible banter, but banter nonetheless.

In short, the crime Mr. Abdullahu committed was allowing illegal immigrants to fire weapons he owned/possessed in the Poconos. He did not arm people devoted to terrorism or violence. Instead, he allowed three people he thought he knew reasonably well to use the guns notwithstanding their increasing penchant for making outlandish and bellicose statements. Moreover, when evaluated in light of the entire trip, it is clear that Mr. Abdullahu had good reason to disregard their rhetoric, notwithstanding the government's repeated assertions to the contrary.

---

[3]Those comments never included any reference to Ft. Dix or any actual plot or intention to attack anyone. There is no recording of such a conversation because it never happened. Also, although the defendant does not agree that the transcripts provided by the government are entirely accurate, he does not believe the discrepancies are particularly problematic.

## POINT II

## POSSESSION OF THE TWO BORROWED WEAPONS

In anticipation of their February 2007 Poconos vacation, the Dukas arranged for Mr. Abdullahu to borrow two weapons from a pizza shop owner in Philadelphia because Mr. Abdullahu had a firearms license. The day before the trip, Mr. Abdullahu accompanied Shain Duka to the pizza shop, presented his firearms license and driver's license to the owner, and borrowed the guns. Mr. Abdullahu transported the guns along with the two he owned to the Poconos. When he left the Poconos two days early, he took all of the weapons with him. The only reason Mr. Abdullahu retained the guns afterward was because he did not know where the pizza shop was located and needed the help of the Dukas to return the guns. On the few occasions when he tried to arrange the return of the guns, the Dukas were too busy with their roofing business and other activities. Mr. Abdullahu did not meet with or see the Dukas after they returned from the Poconos. His only contacts were brief telephone conversations attempting to arrange a return of the guns. This is exactly what Mr. Abdullahu told the FBI when he was arrested and it is exactly what the pizza shop owner told the FBI when he was interviewed. From the perspective of both Mr. Abdullahu and the pizza shop owner, therefore, the guns were borrowed by Mr. Abdullahu for the sole purpose of the Pocono vacation (incidentally, the pizza shop owner declined an invitation to go on the trip which was described as a vacation). It was the understanding of both Mr. Abdullahu and the pizza shop owner that the guns would be returned after the trip. Both Mr. Abdullahu and the pizza shop owner advised the FBI of their separate efforts to arrange a return of the guns through the Dukas, and both explained that their admittedly less than urgent efforts in that regard were frustrated by the Dukas' schedules.

6

Notwithstanding that evidence, the government in its submission to the probation office relied on a number of references to statements by Mohamed Shnewer and the Dukas concerning their claimed access to guns and suggested that the guns held by Mr. Abdullahu were the guns to which they referred.[4] As the above description demonstrates, however, the only consistent and reliable evidence in the case tells a different story. Moreover, whatever the other defendants may have claimed, wished or expressed among themselves while outside Mr. Abdullahu's presence, they never said anything which even remotely suggested any such intention when Mr. Abdullahu was present. Instead, the entire time that Mr. Abdullahu was in the Poconos, it was clear that Mr. Abdullahu owned/possessed the guns and was allowing others to use them on the trip at a shooting range - and that following the trip, he would resume sole possession of the weapons. No one ever suggested that he was holding or would hold the guns for the Dukas or anyone else. Whenever the subject of ownership was raised, it was made clear that the guns belonged to Mr. Abdullahu. The Dukas never said Mr. Abdullahu held the guns for them because he had a license. They never asserted that they had access to the weapons whenever they desired. Instead, Mr. Abdullahu and everyone else in his presence expressed the understanding that access was limited to the shooting range during the trip.

As the recording from February 1, 2007, indicates, the first night they were in the Poconos, Mr. Abdullahu accompanied the Dukas and CW-2 on a trip to gun stores. As the drive progressed, Mr. Abdullahu expressed a willingness to participate in the purchase of a high quality gun. Mr. Abdullahu's purpose was simply to have an opportunity to fire such a weapon - he

---

[4]The government does not appear to rely on this mischaracterization of the facts to support its motions.

enjoyed firing guns. He could not afford such a weapon on his own, and his desire got the better of him - at least in the abstract. As it turned out, he never had to make a decision that night whether to split the purchase with the Dukas. At later points during the trip, however, he did reach a decision and declined to participate when the subject was raised. (2/2/07 18:30:00 - 18:41:30)[5] Whether he would have gone through with a purchase that night is, therefore, at least doubtful, and in the end the interest he expressed proved fleeting once he fully considered the issue.

---

[5]The references to taped conversations identify portions of recordings supplied by the government and refer to the dates and times indicated on the CDs when the files were opened. Any recordings the Court wishes to hear will gladly be provided.

8

## POINT III

### CONDUCT AT THE RANGE AND IN THE POCONOS

The suggestion has been made that Mr. Abdullahu should have been alerted to the nefarious intentions of the other defendants by their conduct in the Poconos in general and at the shooting range specifically. The actual evidence is to the contrary.

As explained earlier, the shooting was one of many recreational activities that were pursued during the trips and there is absolutely no basis to use that activity to impute knowledge about secret designs by others to Mr. Abdullahu. One of the more disturbing mischaracterizations that the government has paraded before the Court on numerous occasions since the beginning of the case relates to the 2006 conduct at the shooting range. The government asserts that, "[a]s the group practiced, they made repeated references to 'jihad' and yelled 'Allah Akbar,' ...." See Government's Sentencing Memorandum at 18. In fact, the questionable/provocative comments at the range that have been identified were made while someone other than Mr. Abdullahu was recording. The person recording the scene - who, by the way, is not among those charged - said "Allah Akbar" several times. While this individual recorded the shooting, someone also said "jihad" and perhaps "mujahedeen". At the time this occurred, Mr. Abdullahu is visible at the far end of the range shooting a rifle while wearing ear plugs in his ears, making it impossible for him to hear or be aware of those comments. The scene at the range throughout the videos was one of barely controlled chaos, with young men taking turns shooting guns with no apparent effort to aim, much less train for some organized assault. If the government is going to argue that Mr. Abdullahu should be punished more severely for comments made by others, they should at least confine themselves to statements that he actually heard.

9

On the second trip to the Poconos, the descriptions recalling the 2006 trip by Mr. Abdullahu and others reflect precisely the disorganized purposeless shooting that was captured on the video - a video which also showed the vacationers hiking, throwing snowballs, visiting ski slopes, and displaying the mundane details of the house they rented. Given that the government has chosen to rely on selected excerpts from the 2006 video that supposedly so alarmed a clerk at Circuit City that he started this investigation, it should also be noted that CW1 - who was paid in excess of $60,000 and who later used a false accusation of terrorist ties in an effort to enlist the FBI to settle a family dispute, see Investigation Reports, attached as Exhibit B - had a relationship with Shnewer that predated the Pocono trip by several months, a circumstance that makes the supposed alarm by the store clerk at least mildly suspicious, especially since Shnewer caused the video to be copied.

The conduct at the range during the second trip was equally disorganized, a characterization that cannot be disputed by the government. The only person who was trying to impose some order and purpose was CW-2, whose payment history, if any, has not been disclosed. As the recordings reveal, this sometimes loudly fearful and sometimes loudly brave, self-described former guerilla fighter from Kosovo who needed protection because he shot some perhaps innocent person six times for revenge, attempted to organize events at the range but was ignored. At one point, CW-2 received a cell phone call from his FBI handlers. During the conversation, CW-2 described a scene of chaos. He indicated that no one was shooting at any targets and expressed concern that no one would listen and that someone would get hurt. He also attempted to convince Mr. Abdullahu to assert some control over the situation - especially with the younger participants - but that effort was utterly futile amidst the chaos.

10

Further context for Mr. Abdullahu's tendency to discount the Dukas' statements is found in the events that occurred at the conclusion of the activity at the range (when CW-2 was back on his recorder). Paintball - the other supposed terrorist training exercise - was discussed as the next group activity. (2/2/07 10:07:00 - 10:12:00) The discussion that ensued is highly instructive in terms of revealing whether there was some ulterior purpose for that activity and why Mr. Abdullahu treated the Dukas' comments without the vigilance the government now demands with the benefit of hindsight and access to far more information than Mr. Abdullahu ever had. First, at no time did anyone even hint that paintball was being used as a means to train for an assault on Ft. Dix or anywhere else. There was no discussion about military tactics or of the value of paintball as preparation for military or terrorist operations. Instead, the scene captured on the recordings sounds like a group of young men picking sides to play touch football or basketball. First, there was a discussion about who should be the captain. CW-2 was elected to captain one side because he was one of two oldest participants. The captains then chose teammates amid laughter about where -on the body - it was acceptable to hit someone during the game. Finally, CW-2 instructed his teammates on how to approach the game, i.e., to wait and let the other side reveal themselves before shooting, at which time one of his teammates indicated that he (CW-2) was the "boss". From the perspective of anyone listening to the conversation, it is simply impossible to conclude that the activity related in any way to anything other than a recreational event.

During the remainder of the time Mr. Abdullahu stayed in the Poconos, there were discussions about a host of subjects including guns, religion and politics. Not once during conversations that occurred in Mr. Abdullahu's presence did anyone mention Ft. Dix or any other

11

United States military installation, and contrary to the FBI account of Mr. Abdullahu's post arrest statement, the only conversation remotely approximating such a sentiment occurred in the context of a late night conversation about religion, the Muslim faith and the treatment of suicide bombers. Although it is true that the Dukas at various times complained loudly about United States military activity throughout the Middle East and with respect to Muslims in general and celebrated the accomplishments of some suicide bombers and mujahedeen, they never indicated that they were planning to attack anyone. At times during those discussions, the sentiment the Dukas expressed was that first they would have to pray to become better Muslims. Then, if at some point Allah chose them, they could travel to some Muslim country for training to fight whomever it was that the Muslims were fighting. These conversations included references to supposedly permissible and impermissible suicide bombers - wrong if used against civilians, permissible if used to fight an invading army. In this context, at least one Duka said that he would never do such a thing and suggested that Westerners never employ such practices. (2/4/07 00:42:30 - 00:47:00) They also indicated at one point a general disbelief in the events of September 11, 2001, but also suggested a Jewish conspiracy if it did happen. (2/3/07 00:30:00 - 00:31:00). For his part, Mr. Abdullahu did not endorse the views expressed by the Dukas and was not even present during many of the late night discussions and video watching that took place. (2/5/07 21:07:00 - 21:11:00) Rather, when he did participate, he raised questions about how religion could be used to justify killing. (2/5/07 21:39:00- 21:45:30; 21:47:00 - 21:51:00; 21:56:00 - 22:08:00) He expressed revulsion at the thought of killing anyone who had not done harm to either himself or his family, and he also indicated that he has never been in a fight and that he has always walked away from confrontation. (2/6/07 11:34:20 - 11:41:30; 11:52:00 -

12

11:54:50)

In this context, another of the government's blatant and irresponsible distortions should be considered. At page 32 of its Sentencing Memorandum, the government makes reference to a video that Shnewer played which showed a Marine's arm being shot off and claims that "the room erupted in laughter." First, as the government is aware, Mr. Abdullahu did not watch the video and was apparently not present when it was played. Second, and perhaps more disturbing given the government's repeated exploitation of this episode, the only "eruption" of laughter comes from the CW.

The often contradictory trajectory of the conversations that Mr. Abdullahu was a party to, when considered in the context of his relationship with the Dukas and the conduct that occurred during the trips, e.g. basketball, swimming, pool, horseback riding and watching movies such as *Scarface, Man on Fire, Wedding Crashers and Mr. And Mrs. Smith,* simply did not put Mr. Abdullahu on notice that the Dukas had some grander purpose for the Pocono trip than otherwise indicated. When the conversations are actually heard, particularly the conversations that occurred on February 1, 2007, it is clear that Mr. Abdullahu's statements are not offered for the truth or meant as anything more than what amounts to a bad attempt at a parody, basically assuming the identity that others cast upon him and others due to their names and backgrounds. There is laughter, taunting and false bravado. As the conversations unfolded over the course of the days that followed, the fact that Mr. Abdullahu at least was not serious becomes undeniable. Also, to the extent that context informs the conversations and more importantly, Mr. Abdullahu's understanding of and participation in them, it certainly must be remembered that he fled a war in

13

Kosovo where Muslims fought to end Serbian (Orthodox) oppression and genocide.[6] With that

as context, it is quite easy to imagine, given his experience, why Mr. Abdullahu would tolerate

comments by people whom he regarded as non-dangerous friends, even when he vigorously

disagreed with the sentiments they expressed. And, although the government wants to dismiss

Mr. Abdullahu's disagreements, the fact is that Mr. Abdullahu repeatedly expressed his position

in the course of what he understood were polemic discussions, that it was wrong to kill or harm

anyone or anything. He also repeatedly expressed a distrust of religion in general and the

Muslim faith in particular, because of the uses to which it was put. (2/5/07 00:21:00 - 00:22:00)

Perhaps most revealing in terms of the government's motion is a review of Mr.

Abdullahu's expressed knowledge about bomb making - something, as the tapes reveal, derived

primarily from the Discovery Channel. When CW-2 tried to elicit some damaging statements by

Mr. Abdullahu, he instead received a lecture on how wrong it is to kill anyone or

anything.(2/6/07 11:39:00 - 11:41:30) Mr. Abdullahu explained that knowing how to do

something like build an explosive device is not wrong, but actually using it to hurt someone

would be. Mr. Abdullahu stated that there were other ways to solve problems and indicated that

he would never shoot anyone or any living thing. (2/6/07 12:22:00 - 12:24:30)

Two final pieces of conversation are worth noting. First, although Mr. Abdullahu did not

ride home with CW-2 and the Dukas, a revealing exchange occurred during the course of that

trip, and is relevant because of the government's repeated reference to the Dukas' use of the

word "jihad". CW-2 asked what the Dukas meant by "Jihad." In response, one of the Dukas

---

[6]As opposed to Roman Catholic Croatians who fought Orthodox Serbs, and
Muslim/Catholic/Orthodox Bosnians who fought each other and Orthodox Serbs for similar
purposes.

14

explained that they meant a personal "struggle" against one's self, an effort to live a good life filled with truth, good manners, good deeds and respect for others. Jihad, it was explained did not only mean to fight, and as far as they were concerned, that was not even an issue for them because even if they had decided they wanted to go join some group overseas - which they had not - there was no way they would be accepted.

Finally, when the Dukas were presented with the AK-47s that they allegedly wanted to use to attack United States military personnel, they expressed no such intent. Instead, they expressed relief that they would no longer have to wait in line at the shooting range in the Poconos. Although Mr. Abdullahu was not present, this is significant for two reasons. First, it casts doubt on the notion that Mr. Abdullahu must have known about the Dukas' hostile intentions because they openly expressed them. Indeed, at the very moment when such a plan was ostensibly within their grasp, there was no reference whatsoever to the plot. Instead, the focus was on waiting in line to shoot at a range.

This leads to the second point, the government's now seemingly abandoned assertion that Mr. Abdullahu was holding guns for the Dukas to use because they had no gun license and were fearful of possessing guns illegally. It is easy to understand why that suggestion has been dropped. Not only is it contradicted by the evidence, it simply makes no sense that the Dukas, who were allegedly afraid to illegally possess a rifle, were willing to take possession of AK-47s, weapons that are simply illegal to own under any circumstances. The idea that the Dukas, who were supposedly planning to attack Ft. Dix, bought AK-47s, but were supposedly unwilling to take possession of a couple of rifles, a shotgun and another handgun is simply ridiculous. Mr. Abdullahu's only criminal act was allowing the Dukas to use the guns in the Poconos. He had no

15

knowledge of any other purpose harbored by the Dukas.

## POINT IV

## MR. ABDULLAHU'S HISTORY AND CHARACTER

The presentence report and attached letters, see Letters from family and friends, attached hereto as Exhibit C, fully reflect Mr. Abdullahu's history and character.  He is a refugee from a war-torn country who has witnessed death and destruction firsthand.  He is lucky to be alive and he has nothing but gratitude for the role the United States played in his survival.  The recent independence accorded Kosovo - which until then was headed by a former KLA member and staunch United States ally Agim Ceku - was made possible only because of the United States, a fact that Mr. Abdullahu appreciates and wishes he could acknowledge in some meaningful way.

Mr. Abdullahu has strived to make something of himself in this country.  As the attached letters also demonstrate, he is much more than the few snippets of secretly recorded conversations cited by the government. He worked doggedly and tirelessly at Shop Rite, as many as 70 hours a week in the weeks leading up to the 2007 trip. As a result, he earned the respect and friendship of those around him.  The stress and pressure associated with his time in Kosovo and the exhaustive efforts to make a life in America, no doubt contributed to the mental breakdown he experienced in 2006. See Report of Dr. Gerald Cooke, attached hereto as Exhibit D.

Agron Abdullahu is a decent, caring human being who unwittingly became enmeshed in events and a drama that he was totally unaware was playing out around him.  The fairly regular pattern of contact between Mr. Abdullahu and the Dukas that existed before 2006, had by February 2007 become exceedingly rare.  Whatever bond existed as a result of the common interests and heritage they shared was no longer relevant due to the changes in their lives and lifestyles.  Between January 2006 and February 2007, Mr. Abdullahu saw and spoke with the

17

Dukas on only a few occasions.  The contacts were always social and never had anything to do with guns or terror plots, a fact proven by the absence of his voice on any non-Pocono tapes. There were no trips to any ranges during that time.   Mr. Abdullahu's decision to go to the Poconos in February 2007 was driven by a combination of nostalgia and a simple desire for a diversion from 70 hour work weeks.  But partly because of the Dukas' irritating habit of raising politics and religion, the trip was less satisfying than anticipated and Mr. Abdullahu left early - just not early enough for the government's taste. Afterwards, Mr. Abdullahu returned to work and had no perceptible contact with the Dukas. In his free time he worked on his car and his house. He helped his parents and his siblings, and socialized with his friends.  He spent his time building a future that had nothing to do with jihad, crusade, terror or violence.

**POINT V**

**OBSTRUCTION ADJUSTMENT**

The government seeks a 2 level adjustment pursuant to U.S.S.G. §3C1.1. The basis for

the adjustment is the drawing Mr. Abdullahu made in his cell following his detention hearing.

The drawing was made - like many others that have been crafted at the FDC - with the light

switch plate. The so-called filing of the plate had nothing to do with making a weapon and there

was never any accusation to that effect. The government's effort to create the appearance that the

condition of the light switch plate was something sinister and violent should be dismissed for the

illusion it is. The circumstances that motivated the drawing - including Mr. Abdullahu's lack of

medication - are set out in the presentence report and the defendant respectfully submits that

there is no basis for the adjustment.[7]

United States Sentencing Guidelines Section 3C1.1 provides for a two-level sentencing

enhancement only if the defendant "*willfully* obstructed or impeded, or attempted to obstruct or

impede, the administration of justice with respect to the investigation, prosecution, or sentencing

of the instant offense of conviction." U.S.S.G. §3C1.1 (emphasis added). While the enhancement

encompasses "threatening, intimidating, or unlawfully influencing a co-defendant, witness, or

juror, directly or indirectly, or attempting to do so," id. at comment. (n. 4(a)), for the

enhancement to apply there must be a finding that the defendant had the specific intent to

obstruct justice. United States v. Dale, 498 F.3d 604, 609 (7th Cir. 2007); United States v.

---

[7]The Presentence Report also makes references to a second incident report based on Mr.
Abdullahu's possession of a line in his cell that was allegedly used to "fish" items in the FDC.
Mr. Abdullahu's line was used to hang clothes - a common practice in the SHU. He notes that he
was not disciplined for the line and, in fact, the line remains in his cell.

19

Hernandez, 83 F.3d 582, 585 (2d Cir. 1996). See also United States v. Hertzog, 186 Fed.Appx. 314, 2006 WL 2034457 at *3 (3d Cir. July 19, 2006) (unpublished) (citing Hernandez for the proposition that the word "willful" in 3C1.1 implies a specific intent to obstruct justice). The evidence proffered by the government in support of this enhancement fails to establish that Mr. Abdullahu intentionally obstructed or attempted to obstruct justice.

In order to determine Mr. Abdullahu's intent in etching a depiction of a firearm firing bullets at the initials "FBI" and the words "Rainca Kosova UCK" into his cell door, the Court must consider the circumstances facing Mr. Abdullahu at the time he made those etchings. When Mr. Abdullahu was arrested he was questioned at length by the FBI. The interrogation was a fairly typical example of the agents gaining the trust of the defendant by assuring him that they knew he was not involved in the overall plot, and that they wanted to help him. The only way they could do that, they explained, was if Mr. Abdullahu cooperated with them. In the course of the interrogation there was extensive questioning about the KLA, including inquiries to insure that Mr. Abdullahu was being truthful when he denied ever being a member of or training with the KLA.

Several days later, Mr. Abdullahu appeared in Court for his detention hearing. He was unshaven, had not been given a razor, and was not receiving his anti-anxiety medication. After enduring a day where he perceived the assurances he had received from the agents had been shredded, and his family and friends insulted and abused, and where he was cast as a near terrorist with possible KLA ties, Mr. Abdullahu, a man who had never been in jail before much less the confinement of a Special Housing Unit where he was subjected to verbal taunts and abuse, was returned to the FDC in an understandably distraught condition. The stress of the day,

20

coupled with his underlying, untreated anxiety, was too much for him to bear and he vented his frustration by defacing the door of his cell with the graffiti described above. "Fury may be exceedingly unpleasant, but alone, it bespeaks no intent to obstruct justice." Hernandez, 83 F.3d at 586.. The government now claims that this juvenile instance of insolence that was already punished administratively, constitutes a threat that warrants additional jail time.[8] If such a response, displayed within the confines of a jail cell can be twisted into the legally significant category of a threat, then under the law any expression of frustration, anger or disappointment about a court decision warrants a sanction. The law, even in the form of the sentencing Guidelines, is not so far removed from reality that such a proposition can be sustained.

---

[8]Seizing upon an opportunity to name drop, the governments manages to work David Hicks into its brief because he once trained with the KLA and Taliban. *See e.g.* Wall street Journal Europe November 1, 2001; the Sunday Times, March 12, 2000. Notwithstanding the fact that Agron Abdullahu was never trained by or a member of any terrorist/liberation (depending on the date) group, including the KLA, it is hard to understand why David Hicks manages to surface in the government's brief as relevant to Mr. Abdullahu's sentencing. However, although they do not share any common ties to the KLA, there is perhaps one relevant parallel - both pled to five year counts.

21

## POINT VI

### UPWARD DEPARTURE PURSUANT TO U.S.S.G. §5K2.14

The Government is seeking an upward departure in this case, pursuant to U.S.S.G.

§5K2.14, on the basis that Mr. Abdullahu "committed a firearms offense under circumstances

creating a significant risk that the Dukas and Shnewer would use the 'training' facilitated by

Abdullahu to commit deadly assaults against others." Government's Sentencing Memorandum at

10. First, Mr. Abdullahu disputes, for the reasons discussed in detail in Points I through III,

supra, that he allowed others to use his firearms for anything other than recreational purposes and

that he knew or should have known of the Dukas' and Shnewer's alleged intentions to commit

any terrorist attacks.

Second, the upward departure in §5K2.14 is only applicable in cases where a real, as

opposed to an empty, threat is present. United States v. Cole, 357 F.3d 780, 784 (8th Cir. 2004).

Section 5K2.14 states that, "[i]f national security, public health, or safety was significantly

endangered, the court may depart upward to reflect the nature and circumstances of the offense."

U.S.S.G. §5K2.14. In interpreting §5K2.14 in the context of a bogus threat of an Anthrax attack

on a school, the Eighth Circuit stated that

> a real, as opposed to an empty, threat must be present. See e.g., United States v.
> Leahy, 169 F.3d 433, 444 (7th Cir. 1999) (holding defendant's possession of ricin
> qualified for departure under [§5K2.14] given that substance's high toxicity,
> undetectable nature, incurable effects, and instability). While [a defendant's
> conduct may cause] a significant degree of apprehension amongst law
> enforcement officers... apprehension is not the same as significant endangerment.

Cole, 357 F.3d at 784. The Third Circuit's jurisprudence supports the Eighth Circuit's rationale.

In United States v. Uca, 867 F.2d 783, 790 (3d Cir. 1989), the Third Circuit reversed the

application of an upward departure under §5K2.14 in a case involving the unlawful purchase of

22

56 firearms, which the defendants intended to ship overseas, on the basis that because firearms

offenses always involve potential threats to public safety, a departure under §5K2.14 was not

available in a firearms case unless the offense increases the risk of harm "to a degree

substantially in excess of that which ordinarily is involved in the offense of conviction."

Conversely, the Third Circuit found that unusual degree of potential harm in United States v.

Hertzog, 186 Fed.Appx. 314, 2006 WL 2034457 at *3-4 (3d Cir. July 19, 2006) (unpublished),

where it upheld a departure under §5K2.14 in a firearms possession case where the defendant

created a real and "substantial risk to others [because he] permitted a five-year old to be present

while his parents fired a Sten gun" and "possessed a loaded gun on his person and another in his

minivan, and maintained ten pounds of black powder in his trailer that could have been ignited

by his frequent smoking."

Mr. Abdullahu's situation is more closely akin to the situations presented in Cole and

Uca, than it is to the circumstances present in Hertzog. Here, Mr. Abdullahu's criminal conduct

was limited to allowing the Dukas to use two firearms he owned and two firearms he borrowed

with the Dukas' assistance at a firing range in Pennsylvania. Mr. Abdullahu did not otherwise

"train," "supply" or "arm" the Dukas or anyone else. Instead, in order to facilitate what he

perceived to be two vacations in the Poconos with friends and their associates, he brought

firearms he lawfully possessed so that anyone interested would be able to participate. The trip

was never described to him as anything other than recreational. There was no suggestion that the

participants were there to "prepare" for an assault on United States military installations or

anyone else. Instead, the shooting was merely one activity among many that the group engaged

in while on vacation.

23

Additionally, even if the Dukas had something more sinister in mind than target practice, that knowledge cannot be imputed to Mr. Abdullahu for the reasons discussed in detail in Point III, supra. Nor could this circumstance support an upward departure because there was never a real threat to national security or public safety during the trips to the Poconos. The government had the Dukas under constant surveillance during those trips and continued that surveillance until their arrest in May 2007. Accordingly, because any threat of harm to national security or public safety was empty and illusory, the enhancement cannot apply.

## POINT VII

### UPWARD DEPARTURE PURSUANT TO U.S.S.G. §5K2.9

The Government contends that an upward departure is warranted under U.S.S.G. §5K2.9,

yet concedes that it cannot establish all of the requirements for an upward departure under this

section. Accordingly, the government's request for an upward departure under §5K2.9 must be

denied.

In Gall, the Supreme Court stated that "[a]s a matter of administration and to secure

nationwide consistency, the Guidelines should be the starting point and initial benchmark" for all

federal sentences. Gall, 128 S.Ct. at 596. Given the continuing importance of the Guidelines in

federal sentencing, it is imperative that the advisory guideline range be correctly calculated. Id.;

see also, United States v. Cooper, 437 F.3d 324, 330 (3d Cir. 2006) (when considering the §

3553(a) factors, the sentencing court must calculate the correct guidelines range).

The government, as the party seeking the upward departure in this case, bears the burden

of proof in establishing the upward departure by a preponderance of the evidence. Cooper, 437

F.3d at 330. In order to apply an upward departure pursuant to §5K2.9, this Court must first find

that Mr. Abdullahu committed the offense of aiding and abetting the Dukas' in possessing illegal

firearms in order to facilitate the commission of another offense, i.e., conspiracy to commit

murder. See United States v. Davis, 380 F.3d 183, 194 n. 9 (4th Cir. 2004) (threshold applicability

of §5K2.9 requires that government proved by a preponderance of the evidence that defendant's

crime was committed in order to facilitate or conceal the commission of another offense; only if

that requirement is met can the court consider the possibility of a departure to account for the

seriousness of that conduct.). The government itself concedes that this threshold requirement

25

cannot be met. <u>See</u> Government's Sentencing Memorandum at 13 ("the Government does not here argue that defendant Abdullahu made the firearms available to the Dukas and Shnewer with the intent to facilitate that conspiracy. For that reason, the United States does not here argue that it has satisfied all of the requirements for an upward departure under §5K2.9."). Accordingly, this departure cannot be applied as a matter of law.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing defendant's Sentencing Memorandum, with accompanying exhibits, was served via hand-delivery upon counsel for the government, Deputy United States Attorney William E. Fitzpatrick at the United States Attorney's Office, 401 Market Street, 4th Floor, Camden, New Jersey 08101 and via facsimile and Federal Express to Assistant United States Attorney Michael A. Hammer at the United States Attorney's Office, 970 Broad Street, 7th Floor, Newark, New Jersey 07102.

Respectfully submitted,


JULIE A. MCGRAIN
Research & Writing Attorney

DATED: March 27, 2008