**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

**UNITED STATES OF AMERICA**

v.                                                        **No. 1:07-cr-459**

**SERDAR TATAR,**

*Defendant*

---

## DEFENDANT'S REPLY

COMES NOW Defendant Serdar Tatar and replies to the Government's Response in Opposition to Defendants' Motions for Reduction in Sentence (ECF Dkt. No. 602) (Herein "GR"). The Court should reject the arguments in the Government's Response.

**I)   The Government's delay in responding confirms that Mr. Tatar should be released.**

The last of several of Defendants' motions for a reduction in sentence were filed on October 23, 2025. ECF Dkt. No. 486. This Court directed the Government to respond to each of the motions by November 24, 2025. ECF Dkt. Nos. 587-590. By December 3, 2025, no response or communication from the Government had been forthcoming, and co-counsel Kathy Manley filed joint letters on behalf of all moving Defendants to decide the motion without the Government's response. ECF

1

Dkt. Nos. 591-594. On December 18, 2025 – nearly a month after the Government's response was due – this Court acknowledged that the Government "has filed no response to any of the pleading motions and has not sought an extension of time or otherwise communicated with the Court regarding its failure to comply with the Court's Orders," and ordered the Government to show cause as to why it has failed to respond and why the relief requested should not be granted as unopposed. ECF Dkt. No. 596. Finally, on December 21, 2025, counsel for the Government entered an appearance – only to ask for a further extension of time to respond to the pending motions.

The Government plainly disregarded the motions, made no effort to respond to the motions in a timely manner, failed to communicate with the Court or defense counsel, and even after finally acknowledging the <u>existence</u> of the motions, needed another extension of time. Additionally, it is worth considering that the Government's ultimate response is an omnibus motion – addressing all Defendants' varying arguments in a single and lengthy brief.

The Government cannot have it both ways. It cannot claim that incarcerating Mr. Tatar (or his co-defendants) serves a vital national security interest, the 3553(a) factors, etc. while simultaneously disregarding motions for the Defendants' release and the Court's related instructions for nearly two months. The Government's

2

delayed response and the total disregard for the existence of the motions that accompanied it contradicts any sincere justification to continue incarcerating Mr. Tatar.

## II)    The Government's citation-void fact claims are misleading.

Unable to muster a meaningful defense of Mr. Tatar's continued prosecution, the Government takes to misleading tactics to exaggerate Mr. Tatar's role, his alleged ideological beliefs, and his circumstances behind the prosecution in general. Notably, absent a single footnote pointing the Court to other filings, none of the Government's factual allegations cite to the record.

## A)    The Government's rendition of the conspiracy is out of chronological order, thereby exaggerating Mr. Tatar's role and obscuring the role of the informant(s).

The chronology of the conspiracy – and Mr. Tatar's role in it – are detailed at length in Mr. Tatar's motion. By contrast, the Government's response seeks to rewrite this chronology by rapidly switching back and forth between the events of 2006 and the events of 2007. First, this drastically exaggerates Mr. Tatar's role in the conspiracy by implying he was involved in every part of it. In fact, as his brief notes, Mr. Tatar was not present for most of the questionable encounters between the informants and the other defendants. He was also not present when his name was used or referenced in contradictory ways.

3

Second, this obfuscation downplays the role that the informants played in prompting and goading the defendants to say things that would be incriminating. Events that took place in 2007 – well after some sort of plot was underway – involve a totally different disposition from the defendants than in 2006, when the informants first began speaking to Mr. Tatar. They also downplay the fact that Mr. Tatar had begun trying to find an in with the apparent terrorists by that point to obtain more information, having failed to get law enforcement to intercept.

**B)     The Government overstates the evidence of Mr. Tatar's motives.**

In an attempt to exaggerate Mr. Tatar's motives, the Government is forced to wrench quotes out of context. As already explained at length – the Court and jury themselves has long recognized Mr. Tatar's lack of ideological zeal and motives, convicting him of only one charge and sentencing him to less time as a result. Additionally, strong evidence – namely, Mr. Tatar's decision to inform law enforcement, his delay in handing over the map, his repeated efforts to avoid providing assistance (including telling the informant to "use [Mr. Tatar's] head" to avoid having to provide a map[1]), his explicit statements disavowing any attack ("I live here, brother"), and his longstanding cordial relationships with the U.S.

---

[1]     This quote, mentioned at Mr. Tatar's sentencing, is also found in recorded conversations between Mr. Tatar and the informant. GX 626-B at 2142.

4

military – suggest that Mr. Tatar was motivated by an initial desire to stop the plot, only to regrettably inculpate himself in it.

Initially, it is worth emphasizing that the Court should decline to consider any factual allegations that are unnecessary to sustain the verdict against Mr. Tatar. Mr. Tatar's motion does not challenge the provision of the map to the conspirators or his failure to divulge the relevant information to law enforcement when they (finally) responded to his tip. These facts are enough to establish his involvement without speculative and misleading considerations about his motives, particularly amid strong evidence to the contrary. See, e.g. United States v. Berry, 553 F.3d 273, 280 (3d Cir. 2009) (...it has never been suggested that [a sentencing court's] discretion is boundless or that the information that a sentencing court may rely upon is beyond limitations of fairness and due process. To the contrary, we have explained that information relied upon at sentencing must have sufficient indicia of reliability to support its accuracy.") (internal citations omited).

The Government's references to incriminating statements from Mr. Tatar, nonetheless, is an unconvincing argument about Mr. Tatar's alleged motives: **Mr. Tatar was only engaged in the same charade as the informant who sought to incriminate him.** Mr. Tatar needed to establish his own credibility as a terrorist to gain trust from someone he believed to be a terrorist, so that he could obtain the

relevant information to pass on to law enforcement. **That is exactly what the informant himself was doing**. Insofar as this is the only apparent indicator that Mr. Tatar genuinely shared the ideological zeal of a terrorist, it is unconvincing amid the evidence to the contrary and the Court should not and need not credit it in resolving the motion.[2]

However, even accepting the Government's descriptions of Mr. Tatar's motives – that he was an ideologically motivated terrorist – the factors underpinning Mr. Tatar's motion for release should still prevail. That is primarily because, as emphasized previously, an actual terrorist plot would have been prevented by Mr. Tatar's decision to inform law enforcement irrespective of what motives the Government attributes to his actions, further emphasizing the injustice caused by this particular sting operation.

---

2    Aside from quotations taken out of context, the Government also makes a passing reference to Mr. Tatar's alleged sale of weapons as part of the conspiracy and the Dukas' suggestion that he bought the weapons for them. GR at 14, note 2. This line of reasoning was virtually abandoned in the Government's summations at trial, and Mr. Tatar was not convicted of any weapons-related offenses. Perhaps this is because, as shown at trial, Mr. Tatar never made any effort to conceal the sale of his weapons, including to law enforcement officers who interviewed him about the conspiracy; it was apparently a legitimate weapons sale that took place prior to the introduction of the informants or the sting operation. See Tr. 6710-12 (Dec. 16, 2008).

**IV)**     **The Government misreads the legal landscape.**

**A)**     **The Government's reading of <u>Andrews</u> is incorrect.**

The Government focuses on language in <u>United States v. Andrews</u>, 12 F.4th 255 (3d Cir. 2021) to imply that Mr. Tatar's arguments are foreclosed. This is a misreading.

*The <u>Andrews</u> Ruling.* Third Circuit's ruling in <u>United States v. Andrews</u>, 12 F.4th 255 (3d Cir. 2021) upheld a denial of an inmate's challenge to his sentence based in part on nonretroactive changes to 18 U.S.C. Sec. 924(c) (mandatory minimums for brandishing a firearm during a crime of violence). In that case, the defendant had argued that the district court wrongly considered the then-existing version of the United States Sentencing Commission (U.S.S.C.) Sentencing Guidelines Sec. 1B1.13 cmt. n.1 as an applicable policy statement, which limited the scope of extraordinary and compelling reasons to medical conditions, age, family circumstances, and "other reasons" as determined by the Director of the Bureau of Prisons. The Third Circuit held that while that policy statement was not binding on prisoner-initiated motions for release, the district court could nonetheless consider it in denying the defendant's motion for release.

*The Updated Guidelines.* In November 2023, the U.S.S.C. updated 1B.13, establishing that it is applicable to prisoner-initiated motions, but also explicitly

7

expanded the list of "extraordinary and compelling reasons" to include some nonretroactive changes to sentencing that resulting in "Unusually Long Sentences". U.S.S.C. Sentencing Guidelines Sec. 1B1.13(b)(6). The updated version also included a catch-all "other reasons" category that permits consideration of factors that are of "similar gravity" to other explicitly listed extraordinary and compelling reasons. (b)(5). As a result of this policy statement, several courts concluded that Andrews had been abrogated. See, e.g. United States v. Edmond, 730 F. Supp. 3d 146, 156 (M.D.Pa. 2024) (Andrews cannot remain binding after addition of Sec. 1B1.13(b)(6)); and United States v. Donald, 2024 U.S. Dist. LEXIS 194290 at *6 (Del. 2024).

   *Rutherford strikes (b)(6)*. In United States v. Rutherford, 120 F. 4th 360 (3d Cir. 2024), the Third Circuit concluded that the U.S.S.C. exceeded its lawful authority in promulgating (b)(6) and concluded that insofar as it contradicted Andrews holding regarding nonretroactive changes to 924(c), Andrews governed. Notably, the Court emphasized,

> Rutherford argues, however, that, in reality, "there is no conflict" between the amended Policy Statement and Andrews because our holding there was relatively narrow. He asserts that "[t]he argument Andrews rejected was that a nonretroactive change, by itself," could create an extraordinary and compelling reason. The government retorts that Andrews "determined that a change in the law, whether considered alone or in combination with other factors," cannot be considered when making a compassionate-

8

release eligibility determination. **We do not have to rule as broadly as the government might like; it is enough to say that the government is right in this instance. The question we are addressing calls for an examination of § 924(c), not a far-ranging examination of all changes in laws affecting criminal sentences...**Therefore, at bottom, our holding in Andrews was that the nonretroactive change to § 924(c), whether by itself or in combination with other factors, cannot be considered in the compassionate release eligibility context. We stand by that ruling today. When it comes to the modification of § 924(c), Congress has already taken retroactivity off the table, so we cannot rightly consider it

Rutherford at 377 (internal citations omitted) (emphasis added).

In sum, Andrews remains good law insofar as it pertains to challenges based on nonretroactive changes to 924(c), and insofar as such challenges could have been considered under the updated guidelines under subsection (b)(6), that subsection is abrogated.

But the Third Circuit has never ruled so broadly as to suggest that any challenge to the length of a sentence for any reason cannot be supported as an extraordinary and compelling; indeed, Rutherford refused to hold even that changes to the law generally could not be considered. As such, cases before and after Rutherford have held that challenges to the length of sentence based on the circumstances that led to that sentence under the (b)(5) "similar gravity" provision are viable. See, e.g. United States v. Robinson, 2025 U.S. Dist. LEXIS 49395 (W.D.Pa. 2025) (rejecting any reading of Andrews that bars consideration of the

circumstances underlying a legal sentence before releasing defendant under (b)(5));
and United States v. Washington, 2025 U.S. Dist. LEXIS 10895 (E.D.Pa. 2025)
(considering challenge to sentence length based on sting prosecution, citing
Cromitie, under (b)(5), before denying relief on the merits).

The Government distinguishes these cases on the facts that underpin them.
But they plainly stand for the fact that challenges to the length of a sentence for the
circumstances that led to that sentence, apart from nonretroactive changes to the
law, are viable challenges under (b)(5).

The Government also relies on United States v. McNeil, 2025 U.S. Dist.
LEXIS 146834 (W.D.Pa. 2025) to suggest that Mr. Tatar's motion is foreclosed.
But McNeil was premised entirely on changes to 924(c), and therefore fits within
the partial upholding of Andrews by Rutherford. Language in that opinion that
refers to (b)(5) should therefore be cabined: the defendant in McNeil was trying to
get around what was plainly a foreclosed (b)(6) claim by shoehorning it into (b)(5).
McNeil does not stand for the suggestion that any sentence length claim is doomed
if brought under (b)(5); if it did, it would contradict the cases discussed above and
would go well further than Rutherford plainly held.

**B)**     **This case is like <u>Cromitie</u>; it is not like the prosecutions cited by the Government, which were not sting operations.**

<u>Cromitie</u>, <u>Williams</u>, and the other sting operation cases cited by Mr. Tatar apply with full force in this proceeding: they are part of the growing body of case law and policy statements from the Executive Branch that challenge government-manufactured "sting" criminal prosecutions. This applies with even greater significance in Mr. Tatar's case: even accepting the Government's biased descriptions of Mr. Tatar's alleged ideological motives, the fact remains that any actual terrorist plot would have immediately been intercepted upon Mr. Tatar's reports to law enforcement.

The Government's attempts to distinguish this case from <u>Cromitie</u> by citing the alleged financial motives in that case are not convincing. <u>Cromitie</u>, too – like the other sting operation cases cited by Mr. Tatar – were overwhelmingly ideologically motivated. <u>See</u> <u>United States v. Cromitie</u>, 7:09-cr-558 (S.D.N.Y. 2011), ECF Dkt. No. 170 at 7-16 (discussing Cromitie's ideological disposition in rejecting his argument that he was not predisposed to commit the crime); and at 16-45 (discussing the evidence of ideological predisposition regarding the remaining conspirators). **What is, of course, distinct about <u>Cromitie</u> is that none of the defendants in that case made any effort, for any reason, to inform law**

11

**enforcement, as Mr. Tatar did. As such, if this case can be distinguished from Cromitie, it is that the prosecution of Mr. Tatar is all the more outrageous.**

By contrast, the cases cited by the Government – United States v. Abdullah, 1:20-cr-677 (S.D.N.Y 2025), United States v. Kelley, 3:22-cr-118 (E.D.Tn. 2025), and United States v. Melzer 1:20-cr-314 (S.D.N.Y. 2024), are not sting operation cases at all. Nor do the cases involving defendants receiving life sentences have any relevance to Mr. Tatar, who was originally sentenced to thirty-three years.

### III)    The Court's resolution of Mr. Tatar's prior motion for release is not dispositive.

The Government cites Mr. Tatar's prior motion for compassionate release, which focused primarily on his vulnerability to the COVID-19 pandemic, decided in 2021. Circumstances warrant that Mr. Tatar's release be granted this time around.

First, the passage of more than five years for a thirty-three year sentence is not a small amount of time. Unlike the prior motion, which was filed before Mr. Tatar had even served half his sentence, the passage of time further weighs in favor of his release with regard to 3553(a) calculations. Mr. Tatar has now served more than half his sentence and roughly 2/3 of the time he will spend before his scheduled actual release.

Second, the Court's prior opinion could not consider the significant change in the way courts and the Executive Branch have come to view sting operations over the intervening years; while there was considerable scrutiny in previous years, significant instances of defendants in alleged sting operations being pardoned or released have taken place in the intervening years as discussed in Mr. Tatar's motion and brief. The Court now has the advantage of considering this seismic shift.

Additionally, the Court did not previously consider the effect of Mr. Tatar's deportation in its denial. That factor is relevant, as it strongly affects the 3553(a) calculations. Compare, e.g. United States v. Hassoun, 470 F. Supp. 3d 804, 805-806 (N.D. Ill. 2020) (releasing man convicted in sting operation bomb plot in part because "this defendant cannot be a danger to the community because he will be deported to his home country" and "defendant will not pose a threat to the United States because he will be deported upon release from BOP custody").

**V)    The Government's exhibits confirm Mr. Tatar's rehabilitation.**

The Government emphasizes that Mr. Tatar has received "ten infractions". But the Government ignores that most of these infractions are minor or took place nearly two decades ago. The most recent infraction – "mail abuse" – is without any substantiation or explanation in the Government's filings and took place nearly six

13

years ago.[3] Most of the other infractions are minor and took place even before that (such as showing "insolence"). While Mr. Tatar apparently had a razor blade in one instance and engaged in a physical altercation in another, those violations took place near the beginning of his incarceration in 2007 and 2008. This history – that potentially significant violations happened decades ago, that all other violations are apparently minor, and that he has had no violations for more than five years, are all consistent with his rehabilitation.

## VI)    The COVID-19 pandemic is a valid consideration in conjunction with other factors.

Contrary to the Government's suggestion, Mr. Tatar's arguments regarding COVID-19 are viable in conjunction with other arguments. See, e.g. United States v. Jackson, 2025 US Dist. LEXIS 65631 at *9 (D. Conn. 2025) (COVID-19 contributes to extraordinary and compelling reasons for release).

## VII)   Mr. Tatar's mother's health condition should be considered.

The Government takes aim at Mr. Tatar's family circumstances claim by calling into question whether his mother is truly incapacitated because her condition did not come with any clear indication that she is confined to a bed or chair and whether he is truly the only one to be able to help because his father

---

3    Mr. Tatar has indicated that the infraction grew out of confusion as to whether or not inmates were permitted to order or subscribe to legitimate magazines from prison.

14

provided no specific information about why his sisters cannot assist. Mr. Tatar submits that his father's statement reliably indicates his mother's incapacitation, where he describes the heart condition as described is a serious and mentions the difficulties it has caused both medically and financially, and confirms that others are unavailable to assist irrespective of why. In conjunction with the other factors listed, Mr. Tatar submits that his mother's health condition and the need to assist his father in taking care of her is a valid consideration that adds to the list of reasons which, taken together, warrant compassionate release.

## CONCLUSION

Mr. Tatar's motion for compassionate release should be granted and his sentence should be reduced to time served.

Respectfully submitted this 9th Day of February, 2026.

/s/ Amith Gupta, Esq.
Amith Gupta, Esq.
GA Bar No. 149222
American Trial Law Litigators, LLC
925B Peachtree St. NE #2151
Atlanta, GA 30309
(408) 355-5782
amithrgupta@gmail.com
On Behalf of the Coalition for Civil Freedoms

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing

DEFENDANT'S REPLY to the Clerk of Court and all counsel of record via the

ECF system.

This 9th Day of February, 2026.

<u>/s/ Amith Gupta</u>

Amith Gupta, Esq.
GA Bar No. 149222
American Trial Law Litigators, LLC
925B Peachtree St. NE #2151
Atlanta, GA 30309
(408) 355-5782
amithrgupta@gmail.com
On Behalf of the Coalition for Civil Freedoms

16